13-MJ-2047
13-MJ-2048
13-MJ-2049

# AFFIDAVIT OF KRISTINA L. NORRIS IN SUPPORT OF ARREST WARRANTS AND A SEARCH WARRANT

I, Kristina L. Norris, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since March 2005. I have been a Special Agent for seven and one-half years. Before joining the FBI, I worked for ten years as a police officer for the Knoxville Police Department. As a special agent, my responsibilities include investigating violent crimes, specifically violent crimes against children as part of the Boston Division Child Exploitation Task Force. I am responsible for investigating kidnappings, child prostitution, and violent fugitive matters. I have conducted numerous violent criminal investigations that involve violent crimes such as murder, rape, kidnappings, felony drug offenses and violent fugitive matters. I have assisted in writing and executing numerous search warrants and arrest warrants in both federal and state courts. I have also received specialized training in examining electronic devices for evidence.

2. I have personally participated in the investigation of this case. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other agents of the FBI, and other federal, state and local law enforcement agencies; oral and written reports from agencies referenced herein; and

conversations and meetings with victims and witnesses; and my own personal participation in the investigation, including witness interviews.

3. Based on my training and experience, I am aware that 18 U.S.C. §1591 makes it a federal offense for any person to knowingly recruit, entice, harbor, transport, provide, obtain, or maintain by any means a person -- or benefit financially or by receiving anything of value from participating in a venture, which has engaged in said acts -- in or affecting interstate commerce, 1) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act; or 2) knowing that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act. I am also aware that under 18 U.S.C. §1591(c), if the defendant had "a reasonable opportunity to observe the person so recruited, enticed, transported, provided, obtained or maintained, the Government need not prove the defendant knew the person had not attained the age of 18 years."

## PURPOSE OF AFFIDAVIT

4. I am submitting this affidavit in support of an application for a criminal complaint charging David MINASIAN, a/k/a "Lazy," and Madonna SAY, a/k/a Donna SAY, (collectively, "Target Subjects") with sex trafficking of a minor or by force, fraud and coercion and aiding and abetting, in violation of 18 U.S.C. §§1591 and 2.

5. I am further submitting this affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a search warrant, authorizing

the search of an Apple Macintosh MacBook Pro laptop computer, serial number W89322FH6HE, (hereinafter, the "Target Device"), for electronically stored information described herein and more fully in Attachment C. The Device is currently in the custody and control of the FBI.

6. As a result of my personal participation in this investigation, through my conversations with other law enforcement officers, upon information that I have received from a variety of other sources, including public records, and my analysis of reports prepared by other officers, I am familiar with all aspects of this investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

7. Between January and July 2012, a female minor, born in 1996, referred herein as "S.S.," was residing at the Germaine Lawrence residential treatment program, located in Arlington, Massachusetts, which is an in-patient drug treatment program for minors.

8. Sometime around July 2012, S.S. ran away from Germaine Lawrence with another minor female. S.S. and the minor went to a house in Chelsea, Massachusetts, where the minor knew acquaintances. S.S. and the minor spent the night in the house. When S.S. woke up the next day, the minor had already left the house. S.S. left the house and began walking around Chelsea, at which time she met a man who identified himself

as "Dave" and by the nickname "Lazy," and who was later identified as Target Subject David MINASIAN. MINASIAN is 24 years old.

9. S.S. told MINASIAN that she was a run away and had no place to go. S.S. told MINASIAN she was 17 years old, when in fact she was only 15 years old. MINASIAN told S.S. she could stay with him and that he was going to "help" her. While with MINASIAN, a silver Dodge Charger pulled up alongside them. A person introduced to S.S. as "I.Z." was driving, and a person known to S.S. as ▮▮▮ was a passenger inside the Charger. S.S. and MINASIAN got into the vehicle and the four began driving around. I.Z. drove to Everett, Massachusetts where MINASIAN and I.Z. engaged in drug transactions with unknown individuals. During this time, S.S., ▮▮▮ MINASIAN and I.Z. were all consuming alcohol.

10. At some point, I.Z. told S.S. that he and MINASIAN were taking a trip, and S.S. agreed to go with them. S.S. later learned that the destination was Kissimmee, Florida. While en route to Florida, S.S. reported that she, MINASIAN, I.Z. and ▮▮▮ stayed in motels in two locations before arriving in Kissimmee, Florida. S.S. does not know in which states the motels were located, but knows they were outside of Massachusetts. During the drive to Florida, MINASIAN gave S.S. alcohol, marijuana, and pills believed to be Percocet, all of which S.S. used. MINASIAN engaged in sexual intercourse with S.S. while they were in a motel room on the second night of the trip to Florida.

11. When the group arrived in Kissimmee, Florida, they went to the apartment of an unidentified Hispanic male whom MINASIAN knew. While at the apartment, S.S.

4

continued to use alcohol, marijuana, heroin and Percocet pills given to her by MINASIAN. MINASIAN told S.S. that she could "work" for him as a prostitute and that he would give her a portion of the money she earned to "help" her. After S.S. agreed to work as a prostitute for MINASIAN, MINASIAN used his phone to take photographs of S.S. wearing only a bra and panties. MINASIAN then began bringing unknown men to the apartment to have sex with S.S. in exchange for money. S.S. gave all of the money she earned to MINASIAN. S.S. stayed in the apartment for approximately one week performing commercial sex acts with men who MINASIAN had arranged for her to meet.

12. After about a week, MINASIAN, I.Z., S.S., and ▮ drove back to Massachusetts. The group stayed in a couple of motels during the trip back to Massachusetts and continued to use alcohol and other drugs. Once S.S. was addicted to the heroin and other drugs, MINASIAN began demanding S.S. pay him for the drugs she used. MINASIAN told S.S. she could continue to work for him as a prostitute in Massachusetts to pay him for the drugs.

13. After returning to Massachusetts, MINASIAN brought S.S. to a house located at ▮ Bryant Street, Malden, Massachusetts, where ▮ resided. ▮ had previously worked as a prostitute for MINASIAN, and MINASIAN had physically assaulted ▮ on a number of occasions. MINASIAN used ▮ house to prostitute ▮ S.S., and other females.

14. MINASIAN directed ▮ and Target Subject Madonna SAY, age 23, MINASIAN's girlfriend, to take pictures of S.S. in sexually provocative poses using MINASIAN's cell phone. SAY then used the photographs of S.S. to create

5

advertisements for "escort services" on MINASIAN's computer, the Target Device, and posted the advertisements in the adult section of Backpage.com, which is an Internet site used for advertising commercial sex activity. MINASIAN paid for the Backpage.com advertisements with prepaid credit cards that he activated using bogus names. MANASIAN and SAY referred to S.S. by the name "Sandy" in the advertisements. Thereafter, S.S. performed sexual acts, including intercourse, in exchange for money with men who responded to the escort postings at ▇ house and at hotels located in Massachusetts. S.S. gave the money she earned from prostitution either to ▇ who then gave the money to MINASIAN, or to MINASIAN directly. MINASIAN set the rates S.S. charged the men for each sexual act.

15. On approximately August 10-11, 2012, MINASIAN, SAY, ▇ and Anthony Ferullo took S.S. to the Hyatt Hotel, located at 50 Forbes Road, Braintree, Massachusetts for the purposes of prostitution. Hotel records show that two rooms were rented in the names of "Madonna Say" and ▇ Security video footage from the hotel shows the group entering the hotel together. SAY rented the rooms for the group. While at the Hyatt, a number of men responded to the Backpage.com advertisements bearing S.S.'s photographs that MINASIAN and SAY had posted. These men were directed to go to the room where S.S. was staying. MINASIAN, SAY and Ferullo waited in one room, and S.S. and ▇ went to a separate room. ▇ remained in the bathroom, to provide some form of protection, while S.S. had sex in exchange for money with an unknown number of men who responded to the

Backpage.com advertisements. S.S. gave MINASIAN the money the men had paid her to have sex.

16. I searched the internet and retrieved four advertisements for escort services that matched the description of advertisements MINASIAN and SAY posted to the internet. The advertisements, some of which were posted on different dates between August 3-17, 2012, contained photographs of a young girl, who I recognized to be S.S., scantily dressed and posing in a sexually suggestive manner. During an interview, S.S. identified herself as the person depicted in the Backpage.com advertisements, and confirmed that it was the advertisement that SAY created and that MINASIAN and SAY posted using the Target Device.

17. The advertisements, which referred to S.S. by the name "Sandy," listed different phone numbers that potential customers should call to arrange for "escort services." S.S. was described as follows: "Beautiful Playmate ready to Melt Your Stress Away… ***SPECIALS* - 22" and "Sexy! Latina! Beauty!" The advertisements were posted on Backpage.com, and covered the geographical areas of the North Shore, Malden, Boston, Cambridge, and Brookline. Customers called the numbers listed on the advertisements to arrange to have commercial sex with S.S.

18. During the time MINASIAN was prostituting S.S., MINASIAN directed ▆▆▆ not to leave S.S. alone because he feared S.S. would leave if given an opportunity. MINASIAN also physically assaulted S.S. and threatened to harm her if she left him. At some point, ▆▆▆ gave S.S. a cell phone and told her to leave the house. After not

7

hearing from S.S. for a period of time, ▇ called the phone she had given S.S. and spoke with S.S.'s mother.

19. On October 22, 2012, the Malden Police Department executed a search warrant that was authorized by Clerk Magistrate Marybeth Bradley, Trial Court of Massachusetts, Malden District Court, Docket Number 1250SW009 (hereinafter, "Malden Search Warrant"), at MINASIAN's residence, located at ▇ Essex Street, Malden, Massachusetts. The warrant authorized the search and seizure of items that were evidence of the distribution of controlled substances. The search warrant authorized officers to seize, among other things, computers, media storage, and cellular telephones. MINASIAN was present during the search and was arrested after officers found drugs, a number of cell phones, and the Target Device during the search.

20. The Target Device was seized during the execution of the Malden Search Warrant. While searching the files on the Target Device pursuant to the Malden Search Warrant, FBI Task Force Officer Robert DiSalvatore, observed photographs in the saved files on the Target Device that were known to him to be photographs of S.S., which were used in the above mentioned Backpage.com advertisements. Detective DiSalvatore immediately stopped searching the Target Device and notified me of the photographs located on the Target Device.

21. Based on the facts described above, I believe there is probable cause to believe that evidence of sex trafficking and transportation of minors to engage in commercial sex is located within the Target Device, which is more particularly described in Attachment A. The Target Device is currently held as evidence by the FBI.

22. Based on the facts described above, I further believe there is probable cause that David MINASIAN and Madonna SAY knowingly sex trafficked S.S., a minor child, by recruiting, enticing, harboring, transporting, providing, obtaining, or maintaining S.S. by use of force, threats of force, fraud or coercion, and knowing that S.S. had not attainted the age of 18 years old and would be caused to engage in a commercial sex act.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

23. Based on my knowledge and training and the experience of other agents with whom I have spoken, I know that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer equipment, software, peripherals, and related documentation be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

   a. The volume of evidence. Computer storage devices (such as hard disks, flash drives, magnetic and optical disks) can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are

    evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

  b. Technical requirements. Analyzing computer systems for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, password-protected, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction (both from external sources and destructive code imbedded in the system as "booby trap").

 24. In light of the volume of data and these technical requirements, it is generally necessary that data, hardware, software, and storage media, be seized and subsequently processed by a qualified computer specialist in a laboratory setting rather than in the location where it is seized. It is also generally necessary for law enforcement officers to seize most or all of a computer system's input/output peripheral devices,

10

software, and computer-related documentation, in order for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment.

25. Attachments B, C and D to the proposed warrant, which contain sections relating to the search and seizure of computer equipment and data, are appended to my affidavit and incorporated by reference.

## CONCLUSION

Based on all of the foregoing, I respectfully request that this Court authorize the arrest warrants for David MINASIAN and Madonna SAY and the search warrant for the Target Device.

Respectfully submitted,

_Kristina L. Norris_
Kristina L. Norris
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on April 8, 2013:

_Marianne B. Bowler USMJ_
HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is an Apple Macintosh MacBook Pro laptop computer, serial number W89322FH6HE. The Target Device is currently in the possession of the FBI.

## ATTACHMENT B

## DEFINITIONS

For the purpose of this Warrant:

1. "Computer hardware" means: electronic devices capable of data processing (such as laptop and desktop computers, personal digital assistants ("PDAs"), and wireless communication devices); peripheral input/output devices (such as keyboards, printers, scanners, monitors, and drives intended for removable storage media); related communications devices (such as wireless cards, modems, cables, and connections), and security devices, (such as electronic data security hardware and physical locks and keys).

2. "Computer software" means: programs, program codes, information and data stored in any form (such as operating systems, applications, utilities, communications and data security software; log, history and backup files; encryption codes; user names; and passwords), whether deliberately, inadvertently, or automatically stored.

3. "Computer-related documentation" means: any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

4. "Storage media" means: any media capable of collecting, storing, retrieving, or transmitting data (such as hard disks, floppy diskettes, CDs, DVDs, tapes and memory cards).

5. "Data" means: all information stored on storage media of any form (such as documents, tables, metadata, audio and visual files, their drafts and their modifications, whether deliberately, inadvertently, or automatically stored).

6.  "A Record" or "Information" is: any communication, representation, information or data, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## ATTACHMENT C

## ITEMS TO BE SEIZED

All records, in whatever form, and tangible objects that constitute evidence, fruits, and/or instrumentalities of transportation for prostitution as set forth below:

A. Records relating to drugs, drug proceeds, drug distribution, drug importation, money laundering, money transfers, ledgers, contact lists, price sheets, and related documents.

B. Depictions, in whatever format they may be kept, containing any sexually explicit visual images, depicting any child known or reasonably believed to be under the age of 18 years of age, in which the child is:

    i.    actually or by simulation engaged in any act of sexual intercourse with any person;

    ii.    actually or by simulation engaged in any act of sexual contact involving the sex organs of the child and the mouth, anus or sex organs of the child and the sex organs of another person;

    iii.    actually or by simulation engaged in any act of masturbation;

    iv.    actually or by simulation portrayed as being the object of, or otherwise engaged in, any act of lewd fondling, touching, caressing involving another person;

    v.    actually or by simulation engaged in any act of excretion or urination within a sexual context;

    vi.    actually or by simulation portrayed or depicted as bound, fettered, or subject to sadistic, masochistic, or sadomasochistic abuse in any sexual context; or

  vii. depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the unclothed genitals, pubic area, buttocks or, if such person is female, a fully or partially developed breast of the child.

C. Any and all images or videos, stored or disseminated of S.S. or other unidentified females in various states of undress which would be consistent with posed photos potentially used for internet ads for sexual conduct for a fee/escorts or portions thereof;

D. Data, files, logs, records, correspondence, bills, account statements, or the like, in whatever format they are kept, that may be evidence showing the use, control, or access to Internet Service Provider accounts held and or used by David MINASIAN or Madonna SAY;

E. Data, files, records, correspondence, bills, or documents showing auto rentals associated with David MINASIAN or Madonna SAY;

F. Digital files, data, or information in any form that may contain or otherwise constitute evidence of access, possession, control and/or use or ownership of any computer, computer media, file, or data of interest;

G. Digital files, data, electronic mail, chat logs, Internet history, notes, memoranda, passwords, writings, correspondence, communication, records, or other information, in whatever format they may be kept, that relate to the:

  i. the use of any of the computer systems or other media or technical devices used to engage in any act of the Targeted Offenses;

  ii. the use of any computer system or other media or technical devices for the purpose of viewing, possessing, receiving, transmitting, or creating child pornography;

       iii.    a list of all directories, sub-directories and file names including metadata and attributes including dates and times the files, directories, or subdirectories may have been created, altered/modified, deleted and/or accessed;

H. Any and all email user names, email content or text messages, stored or transmitted which may contain information specific to running prostitution services, such as information about meet locations, fees for services or other language consistent with the prostitution business or portions thereof;

I. Any and all stored, sent, deleted or draft emails and/or other web-based communications with other persons associated with the organization be it customers, co-conspirators, or the administrators of the web based sites responsible for posting the ads who are involved in running or managing prostitution rings;

J. Any and all information including names of persons and/or phone numbers stored in the "contacts" or "address book" of the Device identifying other potential pimps who may share girls or customer who may engage in the services of prostitutes;

K. Any and all financial records including but not limited to bank statement, credit card bills, debit cards, safe deposit accounts, money order receipts and any other records associated with money storage or dispersal such as online banking, personal income or budgets, receipts or transactions which identifies how David MINASIAN and Madonna SAY earn and spend money;

L. Any and all online searches and web history or other research type documents which may be used to further prostitution activity such as maps of travel, hotel inquires/reservations, etc.;

M. Data specific to travel activity including include dates, times, locations, and routes of travel;

N. Pictures or any documents associated with web-site postings or advertisements, or any other similar types of sites associated with escorts/prostitution activity;

O. Any calendars, date books, or documents showing David MINASIAN's or Madonna DAY's daily routine or activities;

P. Any and all correspondence or other document content associated with Backpage.com and other web-based sites with offer and/or provide web based advertising for "escort" or "erotic" services;

Q. Any documentation showing ownership and control over the Device.

R. Records evidencing the use of the Internet Protocol addresses 208.54.36.186, 71.192.203.91 and 71.147.238.83 to communicate with Backpage.com, including:

    a. records of Internet Protocol addresses used;

    b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

S. Records and information identifying contact information for co-conspirators, communications made in furtherance of the conspiracy, and photographs and videos of co-conspirators.

## ATTACHMENT D

## PROCEDURES FOR SEIZING COMPUTERS AND RELATED DEVICES

1. <u>Seizing hardware and software</u>

Agents are authorized to seize and remove from the premises the computer hardware, software, related documentation, and storage media, so that computer analysts can accurately retrieve the items authorized by this warrant in a laboratory or other controlled environment. The retrieval process does not need to be completed within 10 days after the date of the warrant or before the return of the written inventory required by Fed. R. Crim. P. 41(a).

2. <u>Returning hardware and software</u>

If, after inspecting a seized computer system, the agents and computer analysts determine that these items are no longer necessary to retrieve and preserve electronic evidence, the prosecutor determines that they need not be preserved as evidence, fruits or instrumentalities of a crime, and these items do not contain contraband, they should be returned within a reasonable time, upon written request.

If the computer system cannot be returned, agents should, upon written request, make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that are neither the fruits nor instrumentalities of crime nor contraband.